Case number 25-3304 Marquetta Williams v. City of Canton, OH et al. Oral argument is not to exceed 15 minutes per side. Mr. Beck, for the appellant, you may proceed. Thank you. May it please the court? My name is Greg Beck, and I have the privilege of representing Robert Huber. I would like to reserve two minutes for rebuttal. Once again, we bring a very challenging and difficult case to the court involving qualified immunity. How about that? That might help. Once again, we have, of course, this tragic event involving a qualified immunity analysis. This court, of course, has a rich history in evaluating qualified immunity. We go all the way back to Tennessee v. Garner. That was a case that filtered through the Sixth Circuit, and actually, they made the right decision, even at the appellate level, which was eventually affirmed by the Supreme Court. You've had a lot of qualified immunity cases. You have. So my point here is I would like to start the discussion, if I may, with the issue of the second prong of the normal approach used by courts to evaluate whether a qualified immunity is valid. And that has to do with the reasonable notice test or whether or not this right… Can I start with the prong zero, I guess I would call it, which is just construing the facts? Yes. And your brief insistently suggests that we have to take the facts as if a reasonable officer could have viewed the gun starting to point in the direction of the officer. And that strikes me as just mistaken. It might raise a jurisdictional issue, because it seems to me I watched the video, and a reasonable juror, having watched the various videos, could find as a fact that the gun never moved towards the officer, and it remained celebratory gunfire just after New Year's Eve. So does your analysis change with that conclusion? And if it does, can you explain to me why that conclusion is wrong? Why a reasonable juror couldn't conclude that the gun never moved? Well, first, the video evidence, of course, reveals certain things. We know that BCI did an independent investigation. We know that BCI came to the conclusion, and this is demonstrated through the testimony of the two special agents, Mr. Armstrong and Mr. Morin, that the gun, in fact, was moving at the time of Mr. Huber's firing, and it's consistent with his testimony, number one. So there are facts… I agree with you a jury could find, based on his testimony, that the gun was moving. But it seems to me we have to take the facts in the light most favorable to the other side in this case, and I think a reasonable jury could also, having watched that video, conclude that it wasn't moving in the direction of the officer. Your Honor, I appreciate that point, and what I'm suggesting is our appeal is still viable, because I believe that there could be, in a certain case, an indication that there could be a factual issue with respect to whether or not the constitutional right was violated, but the alleged right that was violated may not have been clearly established. Yeah, I agree with that, but we have to… For both prongs, there's just a fundamental factual question. I think your case is a lot easier if the jury were to find as a fact that that weapon started moving towards the officer. Well, it would. I would agree with that, but I think we have to say, is it clearly established that you can shoot somebody for engaging in salvatory gunfire on New Year's Eve into New Year's morning? Well, I think… Would you say that officers can just shoot people who officers know are shooting in the air in celebration? The direct answer to that question is probably not, but the issue that has been created through my friends and their arguments is that this issue of celebratory gunfire is a real thing. I mean, it's mentioned in Rahimi. There's been laws on the book since the founding. I mean, it shows it's dangerous, so I grant you, but it's not something that's made up. It's a dangerous activity that has happened since the founding, drunken revelers on New Year's Eve. It's a quote in Rahimi. I agree, but police officers judge any gunfire as just gunfire, and they have to treat it as dangerous regardless, and you are correct. Someone that's deciding to have a good time engaging in many things, like firing a military-grade weapon with a drum magazine, semi-automatic, that is extremely dangerous. In fact, the district court even admits that that was imminent danger. So the real question then becomes when an officer is suddenly confronted with imminent danger by definition, by the mere act, because the problem that we always have in these qualified immunity cases is that we have to look at the circumstances of each case. What is unique about this case? Well, first of all, we have not been able to find any case that is on all fours with this, and why is that? Because even if celebratory gunfire is something that might be happening across the country and even in Stark County, Ohio, it's not this kind of firing. This weapon is the weapon of weapons. It is absolutely the most dangerous weapon in America right now, and officers are trained to not only use it, understand it, but find a way to deal with it. There's a reason that it is the weapon of choice for mass shooters. It's penetration power, it's speed, it's ease of use. And we train our officers to do one simple thing, which requires incredible courage. They are supposed to run and go directly at the shooter. They're not supposed to cower, they're not supposed to seek a safe haven, as mentioned by the district court. They are supposed to go right to this problem. So what we have here... Well, what if the fence wasn't there? What if he could clearly see, again, taking the facts in the light most favorable to the plaintiff, what if he could clearly see that this dangerous weapon was being just fired up? Do you think that that would make a difference on clearly established? That it's obvious you can't shoot somebody who's just clearly shooting up, even at high volume? Well, if the danger is real, even without the fence, to the officer, certainly. But I think the other fact we seem to be forgetting... Can you finish there? Thank you. The other fact we seem to be forgetting is that this type of activity, this type of firing, does not create a risk for the public. I mean, these bullets come down. These two, two, three rounds, with penetration power. I mean, there is no doubt that if this gun moved down another six inches, it would have cut him in half. That's my point. Is your theory of the case that everybody agrees that bullets... That's why it's been illegal since the time of the founding, too. Bullets that go up come down, and they oftentimes harm others around where they come down. But that suggests to me that it's obvious, or at least it's not obvious, that officers are allowed to shoot individuals who shoot in the air to stop the firing. That seems somewhat of a dramatic rule to me. But that seems... Under the facts that we have to take in the light most favorable to the plaintiff, that seems to be where the rubber hits the road, in my mind. I think, Your Honor, before I start to judge Katz, that begs the question, correct? In other words, that's the whole issue. That's the problem. An officer trained to go to the source facing this deadly fire has no ability to warn just because of the magnitude of it. And we know that is true based upon the facts. You can barely hear Officer Huber shooting these rounds. Mrs. Williams, who was right outside, didn't hear the report. So a warning wasn't available. Imminent danger is being created for the public and for the officers there. And if there is no case that says to a police officer, who now we are telling, you're training your jobs to run to the source of this rapid, horrific gunfire, don't hide, don't cower. And in many ways, it's akin to the discussion that Justice Kavanaugh had in Barnes, where he was talking about there's no good option for any police officer in certain circumstances. So my statement is, and our position is, is that the question has not been answered by the courts as what an officer has to do in that circumstance. Just to clarify, you've repeatedly said when answering Judge Markey's question that imminent danger is being created for the officer and the public. And you would like us to evaluate the clearly established wrong based on what creating that danger, just a vertical shot by or round of shots by this weapon and not, as you've asserted in your brief, that the gun was moving toward the officer. Just a complete vertical gunfire with this dangerous weapon is how we should evaluate it. Well, if we actually look at the video evidence in conjunction with the system. But as Judge Murphy told you, we have to assure ourselves of jurisdiction. It's one of the things that we have to do. And here, as Judge Murphy was saying, we have to take the facts in the light most favorable to the plaintiff and as construed by the district court. And I'm wondering, do you want us to go forward and answer the clearly established question without the idea that the gun is moving towards the officer? I believe we should have an answer to both questions because the movement of the gun, the imminent danger created by this activity and is in and of itself creating a mixed fact and legal question. An officer should actually... Right, so there can be harm, as I hear you, and danger just from shooting vertically in the air because there's gravity and the bullets are going to come down. And as you have also stated, that this is a really powerful weapon. So we have the fact that the bullets will come down and then this is a very powerful weapon. When we're looking at the clearly established prong, are we supposed to also, based on your argument, look at whether the gun is moving towards the officer? Or should we answer the question without that suggestion from your brief? I think we have to answer that. That question, in the record, let me just say this. The video evidence does not refute Officer Hubert's position. I think you can answer that question, however, as to whether or not the gun is... Right, but a jury doesn't have to take Officer Hubert's testimony either. And again, at this point, we're concerning in favor of the plaintiff. And we have to take how the district court considers the facts, unless they're blatantly contradicted by the record, which they're not here, given the video, which we've all, of course, watched. So I'm asking, do you waive the argument that this is clearly established just based on the fact that this is a powerful weapon being shot vertically in the air? Or would you like us to go ahead and answer whether this is clearly established just based on those things without this idea, this subjective testimony, that the gun is moving towards the officer? I would like the court to review the entire record, which includes the BCI independent investigation. I recognize that what Officer Hubert testified about, he saw, of course, is unchallenged from a witness, but my friends are suggesting that the gun is not moving, but we have independent information from BCI that at least doesn't refute what Officer Hubert said. And in fact... So just to clarify, for the purpose of this appeal, you are not conceding that the gun is just being shot vertically into the air? I am not conceding that, Your Honor. I'm sorry, but that is my position. I just wanted the clarification. I appreciate you giving it. Well, let me look at the videotape, right? So this is going to be two stories. One option could be that he's lowering the gun. Another option could be that he's not lowering the gun. Lowering the gun, that seems to provoke the risk to the officer that the gun could be shot at the officer. He's not lowering the gun. He's still spewing bullets into the air, I think 35 or 40 bullets. Correct. And there's a chance that that is a risk to people in the community. And on page 26 of your brief, I think you talk about the apparent dangerousness of engagement. Correct. So if we agree with you that he's lowering the gun, if we watch the video and think he's lowering the gun, we can assess that risk to the officer. If we disagree that he's not lowering the gun, we can still consider that question of whether he's shooting the gun in the air, which we can do if we're watching the video, and that's a fair question for us to resolve. It's the backdrop of all the law that governs this area. Yes. You're willing to concede the facts. You're willing to concede that if he's not lowering the gun, we should at least evaluate the issue of whether he's shooting the gun in the air because that creates an obvious risk or some kind of risk to people. Correct. And then whether it was clearly established, even under those facts, for an officer to not fire given this imminent danger created by this weapon. I can save this for rebuttal. I'm out of time. Your rebuttal time. Thank you. Good morning, Your Honors. May it please the court, Justin Howell, on behalf of Plaintiff Pepelle, Marquetta Williams. Sorry, Your Honor. Is that better? Okay. Justin Howell, on behalf of Plaintiff Pepelle, Marquetta Williams, is the administrator of James Williams, deceased. Each of the defendant's appellant's assignments there in this case is without merit, and this court should affirm the district court's decision below. First, consistent with the Supreme Court's recent decision in Barnes v. Felix, the district court directly analyzed the totality of the circumstances because those events leading up to the shooting itself directly inform whether or not defendant Huber's conduct in this case was reasonable and whether his assessment of the scene, that this was an inherently dangerous situation, is reasonable. Can we just jump to step two of the qualified immunity analysis? That seems to be the trickiest part for you. Assuming that the gun is being shot in the air, I think you have to rely on the obviousness approach to establishing a clearly established violation of law because there's no precedent that really matches this. The district court relied on precedent suggesting that mere possession of a gun is not enough to show a serious threat of harm. But obviously, there's more than possession here. There's active firing repeatedly. So I just don't see a case that really rivals this one. Yes, Your Honor, I agree there's not a case that's directly on all fours with this case. But I do think that this court, as well as the Supreme Court, has repeatedly said that there doesn't need to be a case directly on all fours for a right to be clearly established. That's if it's an obvious violation, the obvious case. And I think the district court determined that this was an obvious case. The district court analyzed all of the factors in Tennessee v. Garner and Palmer. And so why... This has been illegal since the founding, so that's why they've talked about it. And it's obvious why it's been illegal, because it's a highly dangerous activity, especially the number of rounds being shot with a rifle. So why would it be obvious that you shouldn't be able to neutralize the inherent danger in the activity? Well, Your Honor, I think, you know, all of the factors, the court determined all but one of those factors weighed in favor of plaintiffs. But to answer your question more directly, sure, there's a potential danger to people in the community by firing into the air. I think we can all agree on that. But you have to look at the totality of the circumstances. What time of day was it? I mean, it was midnight on New Year's Eve. There's not going to be probably a lot of people out. There's no evidence in the record that there were people out in the area. There's literally no evidence whatsoever in the record that anyone else was put at risk. It's a pretty dense area, right? It's downtown Canton. It was a residential area in the city of Canton. I would also add that... Do you think it would be different if it was a parade? So lots of people outside? I think it could be different, Your Honor. But I think the fact that really distinguishes this case as well is the fact that Mr. Williams... The evidence suggests he was entirely unaware of Officer Huber's presence at the time. He never made his presence known, never issued any warning, never issued any commands. I think if he activates his lights and sirens and uses his PA system on his car, Mr. Williams likely immediately ceases firing his weapon and puts the weapon down. And so I think that's a huge factor. Tennessee v. Garner says that if it's feasible to give a warning, you have to give a warning. And Defendant Huber himself testified that at the point he was up on the front porch viewing Mr. Williams after the first round of celebratory gunfire, so he had reason to believe that it was celebratory in nature. He said he could have easily retreated back to his vehicle. In fact, it was his intention at that point to wait for backup to arrive. I would also like to address this notion that it was his training to run directly at the gunfire. I mean, that's at least in dispute on this record. We have experts in the case who will say that that's absolutely not the way that officers or reasonable officers are trained to respond to gunfire, that the smart thing to have done was announce your presence, wait for backup to arrive, so that you can further assess the situation. I guess maybe another way to ask that, though, is it clearly established that an officer would never run towards gunfire? I don't think that's not been addressed, Your Honor, but I don't think that's really the core issue in this case. I think the core issue is the video and whether Defendant Huber was in imminent harm at the time of the shooting. And I think Your Honors have correctly stated that it's a factual issue for the jury to decide. And so the qualified immunity analysis, and this is in King v. Taylor, Braden v. Cureton, just last year, and Heater v. Bowers, that if the immunity analysis turns on which version of the events that the jury determines is correct, then... We take the... We look at the video, right? So we can draw conclusions. It shows a lot. Maybe it doesn't show everything, but it shows a lot. So we look at that, but we then, you know, round that out with any... A view of the record that's favorable to your client. But you can see a gun being shot in the air like 30 or 40 times, right? Or the officer... That's undeniable, right? Correct, Your Honor. I don't know how many times, but it's quite a bit. You can count. You agree that this was in an urban area. It's a dangerous weapon. And you agree that there's some risk to people in the community. In fact, I did research. I found every year that we could find, basically, people who were killed, specifically, by falling bullets. I assume you don't contest that. I love to answer, but if you don't contest that, is your point that this was not dangerous enough, that this is a dangerous... What your client was engaged in was a dangerous activity, but it wasn't dangerous enough to justify the officer's action. That should be obvious to every officer. Well, Your Honor, I would say that I don't think there was any evidence in the record that the risk that this posed to residents... I mean, the focus was always on the risk that it posed to defendants. He argues in his brief that this was a risk to other people that was inherently dangerous. Sure, I think... Okay, but all the things I told you were just things that I don't know that they have a record on. I mean, we saw... We zoomed through the gun. We see how many bullets. We know this is happening in the downtown community. It's pretty dense. It's not happening in my hometown where you can shoot for miles and not find anybody. We know all those things. We know it's a risk. Are you saying it's not a risk to anyone? No, I'm not saying it's not a risk to anyone or a potential risk. I'm just saying... What is the only evidence in the actual record? Because I do agree that it just... It's unclear to me how risky this is. The only data point I can tell is that it's just a misdemeanor. I suppose he engaged in 30 or 40 misdemeanors because each one would be a misdemeanor. But does that suggest anything about the risk that if it was like, you know, one in 10 are being hit by these things that we would think that it should be a felony instead of a misdemeanor? It's correct that it's a fourth-degree misdemeanor, Your Honor. I think if there was clearly a problem that this was a serious and imminent threat of harm to others, that the legislature would make it a more serious crime. And I think that's the key distinguishing. Is there any other... So that's one data point. What are the other data points other than our own common-sense notions that what comes up must go down? Are there any other evidence like statistics about how often people are hit? Because I do find these matters relevant, I suppose, but I just didn't see other than my own kind of independent research on studies. Well, the defense argues in its brief that there's a risk to others. It never really developed that factual record in the district court. There's no expert testimony as far as I can tell on the statistics of how imminent a threat is to others, and I think that's the key issue. Is it a serious and imminent threat? And that's what this court's looking for. I just sort of want to ask you also, so you're arguing, you're conceding this is dangerous to other people. Potentially. I mean, it's... I mean, but the things that people do that are potentially dangerous to other people can justify serious officer interaction. So I feel like maybe there's a scale of how dangerous it is or how much of a threat it is to other people. Well, I think that's why it's important to consider the totality of the circumstances. You know, what time was it? The analogy, I'm just trying to think of analogies. Driving drunk is dangerous. Correct. Can we shoot people who drive drunk? Not to my knowledge, Your Honor. But what is, how, is this more dangerous? That's, I mean, it's a risk. I think it's obviously dangerous. It's just the risk. Is there a 1% chance of getting hit or a .001% chance of getting hit versus, you know, a 10% threat? I think our common sense and collective experience would say it's less of a risk than driving. It strikes me that how much of it a risk, it's a risk. We've been talking about statistics, you know, like in Stark County, like the risk would be very different in different places, more deaths or things like that. You know, the statistics tell us so much, but it seems like the actual facts on the ground and what we know from as we take it from the perspective of the officer, and I'm curious here if there were facts in the record, like did the officer see other people around? Did the officer see other people in the backyard? I think we know there was somebody else in the house, but I don't know that we have in the record that the officer saw that. Like from the officer's perspective, which is how we take it at Qualified Immunity here, where, I mean, this wasn't a parade, but it also maybe wasn't Judge Riedler's hometown, but what do we know given, like, this actual record of what the officer knew? Your Honor, there is no evidence in the record as to whether there were people outside. Bennett Huber always focused on in his testimony that he perceived the gun coming down towards him. That was the basis for his decision to shoot James Williams. I would say that that's a factual issue. So he never justified his shooting with an imminent harm to others. That's a point that was raised in the briefs by counsel, but there's no citation to any evidence in the record that supports that it was an imminent threat of harm to others in the area. Imminent's doing a lot of work there. I'm just trying to figure out what the standard is, because you have to, I appreciate there's obligations on their side, but you have to show this was an obvious, assuming we don't think it was foreclosed by a prior case, you have to show us that it was obvious that no officer would ever shoot your client in this circumstance, essentially. Yes, Your Honor, I think the facts leading up to this situation, I mean, Officer Huber testified after watching Mr. Williams do a first round of celebratory gunfire. He looked into the window, saw him putting the weapon away, didn't see a volatile situation in the house. At that point, he determined there was no exigency to the situation. Could have easily gone back to his vehicle, he conceded, called for backup, announced his presence again. That's all true. But then he knows that Williams comes out and has the same rifle and shoots it into the air if anything happens. He's re-instigated. He could have thought, he's done, he's done celebrating. Obviously, this is a tragic case. We're just asking a question, kind of what the legal answer is. But he knows your client comes back out and shoots a gun many, many times. He's got that new information to reassess. So he knows it's in an urban area, we know it's at night, but we know it's a night where people are celebrating. I think I saw some instances where wolves would come through a home and actually harm someone or kill someone, so there's a lot of data points that are trying to sort through to figure out where this falls on the dangerousness scale. But I think, Your Honor, he could have alleviated the danger by using less lethal measures, by simply going to his vehicle and activating his lights and sirens. If I'm disagreeing with Judge Murphy's framing of the issue, you have to show that essentially it's obvious that even though there's no case on point, every officer would know you never shoot someone who's serving a case. You're saying that's a category where you have to consider lesser measures and never take this measure. Well, I think that's one issue, Your Honor, that Tennessee Garner says you have a duty to warn where feasible, and it was feasible in this case. Is there any, I suppose not, there's no evidence in the record since this is tragically all too common, is there any training from police officers on how to approach this? There is, there's expert testimony in the record as to what best practices are and the best practices from our expert would say that you tactically retreat, you announce your presence to let the person know that you are there so hopefully at that point they stop firing their weapon because they realize there's a police officer on the scene. And if, you know, it doesn't, nothing happens after doing that, you wait for backup to arrive and you assess the situation further and act at that point. There are other, I agree with you, there are other alternatives. Again, you have to show that no officer would ever disregard those alternatives in these circumstances. They would never do essentially what happened in the fall. Struggling with that? I'm struggling with that? Well, Your Honor, I honestly think it comes down to the fact that I think a reasonable jury could determine that the weapon did not present a serious threat of harm to officers. That's a legal question. In my view, the jury would decide whether the gun was coming down. Correct. That would be the deciding data point if we agree with you on this. Because we would either say it's clearly established that there was a violation that you can't shoot somebody engaged in self-injuring gunfire or we'd say that if it was coming down then it would be a violation, in my opinion, of shooting. So that's the critical facts on which the case would be. Correct. Your Honor, I would say that this circuit's prior precedent on qualified immunity doesn't slice such a fine line. You have to have a case that's directly on point. You have to view the totality of the circumstances. I just don't think we have a case in ballpark in this case. All the cases either deal with possession... Well, there are certainly cases, Your Honor, where an individual has a firearm and it's perceived that he points it in the officer's direction or where a bystander or another person in the home might be at harm. I know you're almost out of time, but suppose this was a rocket launcher. Slightly more dangerous weapon. A rocket launcher could be used to shoot something in the sky. If that hits a home or something, it could do a lot more damage. Is that a significantly different case? I think it is a significantly different case because I think an explosive device that is going to definitely cause harm wherever it explodes is different than potentially a falling bullet hitting somebody who happens to be standing directly in the path of that bullet at midnight outside in a residential area. I think that is a significantly different case and presents a significantly more imminent risk of harm than the case here. Thank you very much. Thank you, Your Honor. Jack, you have two minutes. First of all, with respect to the training issue, there's ample testimony from the Canton hierarchy that this training that they're taught because of this prevalent mass shooting that's happening in America is they automatically have this mantra they all follow, followed by Officer Huber, stop the killing so they go straight to the shooter, straight to the source, and then stop the dying, see if you can help first aid. So that's in the record. That's the training. He responded pursuant to his training. So stop the shooting even if they're not shooting at anyone? Possibly, because many times, as you know, Your Honor, there are police encounters after the shots have been fired that were dangerous and the person maybe doesn't drop the weapon or whatever, the police are going to respond, and they may in fact still have to use deadly force in that situation. And it's all very fact-specific. But that is the problem that we're running into, and we're trying to find the balance. I mean, the qualified immunity issue is seeking the balance, and that's what we're talking about here. And this clearly enters into that hazy border that the cases all talk about and this Court has talked about. And we have all scoured the case law, and I think the only case that we've found that even comes close from this circuit is Thomas v. The City of Columbus, 2017. That was a case where the officers were investigating some criminal activity in a neighborhood, and one of the potential suspects was running at an officer. He had a gun in his hand, but he hadn't pointed it. He gave no other indication except he was running at the officer. The officer shot him. The claim was excessive force. And what this Court said was about 40 feet initially separated Kaufman from that person, and the distance only shrank as the person came at him. At this range, a suspect could raise and fire a gun with little or no time for the officer to react. What did you think of my... That was the question I was going to ask you at the end of your rebuttal. It's hard for me to now assess the risk of harm to others from shooting in the air. It's a misdemeanor. I guess that all the chance of harm is not that high because I think it would be a felony if there was a significant risk. The analogy to drunk driving. Suppose a bar calls somebody and says, this guy just got into the car. I can't believe it. He's absolutely intoxicated. And then you see him driving down the street, can't stop him. Could you actually shoot at that individual? Or do you think it would be obvious that you can't shoot at drunk drivers? According to this court's precedent, probably not, given the circumstance, unless he was heading toward a parade or something and the officer felt this was inappropriate. I don't believe that could happen. Do you think it would be an obvious case that you can't do that? Shooting into a vehicle for a drunk driver, yes. Definitely. But if the risk of harm from a drunk driver is analogous to the risk of harm to shooting in the air, why wouldn't the same result apply? Because if we look back at what Bernie V. Conner was really talking about, I mean, this young man was killed fleeing without a weapon. It seems to me that what, and the court said severity of the crime, but the court was not measuring how the legislature or city council might tab it as a penalty. But it was the severity, and your analogy was the one that I was going to use, Your Honor. I mean, firing a weapon may be a misdemeanor until it kills somebody. Driving drunk is only a misdemeanor until it kills somebody. And so it is the severity of this coupled with the magnitude of this weapon and what it really represents in America today. And I think that is really why there is no case, it is not clearly established that Mr. Williams in this tragic situation could have been freed from deadly force. And so we ask that the court overrule the decision of the district court in our final judgment. Thank you very much. Thank you. I appreciate your arguments. The case will be submitted.